Christina M. Martin, OSB #084117
Lead Counsel
Pacific Legal Foundation
4440 PGA Blvd., Suite 307
Palm Beach Gardens, Florida 33410
Telephone: (561) 691-5000
CMartin@pacificlegal.org

Wencong Fa, Cal. Bar No. 301679*
Daniel M. Ortner, Cal. Bar No. 329866*
Pacific Legal Foundation
930 G Street
Sacramento, California 95814
Telephone: (916) 419-7111
WFa@pacificlegal.org
DOrtner@pacificlegal.org

Glenn E. Roper, Colo. Bar No. 38723*
Pacific Legal Foundation
1745 Shea Center Dr., Suite 400
Highlands Ranch, Colorado 80129
Telephone: (916) 419-7111
GERoper@pacificlegal.org

*Attorneys for Plaintiffs*
* *pro hac vice*

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

### PENDLETON DIVISION

| | |
|---|---|
| KATHRYN DUNLAP and JAMES DUNLAP, | Case No. 2:21-cv-00942-SU |
| Plaintiffs, | |
| v. | **PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION PURSUANT TO FRCP 65** |
| THOMAS J. VILSACK, in his official capacity as U.S. Secretary of Agriculture; ZACH DUCHENEAUX, in his official capacity as Administrator, Farm Service Agency, | **REQUEST FOR ORAL ARGUMENT** |
| Defendants. | |

Plaintiffs move pursuant to Fed. R. Civ. P. 65 for a preliminary injunction enjoining Defendants Tom Vilsack, in his official capacity as U.S. Secretary of Agriculture, and Zach Ducheneaux, in his official capacity as Administrator of the Farm Service Agency, from enforcing the "socially disadvantaged" provisions of Section 1005 of the American Rescue Plan Act of 2021, Pub. L. No. 117-2, 135 Stat. 4. Defendants should be enjoined from providing any further loan assistance to "socially disadvantaged" farmers and ranchers under Section 1005 until the merits of Plaintiffs' claims can be resolved. Pursuant to LR 7-1(a)(1), Plaintiffs' counsel conferred with Emily Newton and Michael Knapp, attorneys for the U.S. Department of Justice who are representing Defendants in related cases and are expected to represent Defendants in this case. The relief sought in this motion is opposed.

As further explained in the accompanying memorandum and declarations by Plaintiffs Kathryn and James Dunlap, a preliminary injunction is proper because all of the factors for the issuance of a preliminary injunction are satisfied here. (1) Plaintiffs are likely to succeed on the merits of their claims, (2) Plaintiffs would suffer an irreparable harm absent a preliminary injunction, and (3) both the balance-of-the-equities and the public interest factors, which merge in a case where defendants are government officials, weigh in favor of issuing the preliminary injunction. The Court should therefore issue a preliminary injunction without requiring a bond.

DATED: June 29, 2021.

Respectfully submitted,

Wencong Fa
Cal. Bar No. 301679*
Daniel M. Ortner
Cal. Bar No. 329866*
Pacific Legal Foundation
930 G Street
Sacramento, California 95814
Telephone: (916) 419-7111
WFa@pacificlegal.org
DOrtner@pacificlegal.org

By /s/ Christina M. Martin
Christina M. Martin, OSB #084117
Pacific Legal Foundation
4440 PGA Blvd., Suite 307
Palm Beach Gardens, Florida 33410
Telephone: (561) 691-5000
CMartin@pacificlegal.org

Glenn E. Roper
Colo. Bar No. 38723*
Pacific Legal Foundation
1745 Shea Center Dr., Suite 400
Highlands Ranch, Colorado 80129
Telephone: (916) 419-7111
GERoper@pacificlegal.org

*Attorneys for Plaintiffs Kathryn and James Dunlap*
*\* pro hac vice*

Christina M. Martin, OSB #084117
Lead Counsel
Pacific Legal Foundation
4440 PGA Blvd., Suite 307
Palm Beach Gardens, Florida 33410
Telephone: (561) 691-5000
CMartin@pacificlegal.org

Wencong Fa, Cal. Bar No. 301679*
Daniel M. Ortner, Cal. Bar No. 329866*
Pacific Legal Foundation
930 G Street
Sacramento, California 95814
Telephone: (916) 419-7111
WFa@pacificlegal.org
DOrtner@pacificlegal.org

Glenn E. Roper, Colo. Bar No. 38723*
Pacific Legal Foundation
1745 Shea Center Dr., Suite 400
Highlands Ranch, Colorado 80129
Telephone: (916) 419-7111
GERoper@pacificlegal.org

*Attorneys for Plaintiffs*
*\* pro hac vice*

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## PENDLETON DIVISION

| | |
|---|---|
| KATHRYN DUNLAP and JAMES DUNLAP, | Case No. 2:21-cv-00942-SU |
| Plaintiffs, | |
| v. | **MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| THOMAS J. VILSACK, in his official capacity as U.S. Secretary of Agriculture; ZACH DUCHENEAUX, in his official capacity as Administrator, Farm Service Agency, | |
| Defendants. | |

*Memo. ISO P. Mot. for Prelim. Injunct.* - i

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. iii

INTRODUCTION ............................................................................................................ 1

BACKGROUND ............................................................................................................. 3

    I.   Section 1005 of the American Rescue Plan Act of 2021 ....................................... 3

       A.   Text and Operation of Section 1005 .............................................................. 3

       B.   Congressional Purpose in Enacting Section 1005 .......................................... 4

       C.   The Federal Government's Response to Alleged Historical Discrimination Against Minority Farmers ....................................................................................... 5

       D.   Defendants' Subsequent Proffer of Evidence ................................................ 7

    II.   Plaintiffs and Procedural History ....................................................................... 7

STANDARD OF DECISION ........................................................................................... 8

ARGUMENT ................................................................................................................... 8

    I.   Plaintiffs Are Likely to Prevail on the Merits ...................................................... 8

       A.   Section 1005 Does Not Further a Compelling Interest .................................. 9

       B.   Section 1005 Is Not Narrowly Tailored ...................................................... 13

          1.   Section 1005 uses a rigid race-based remedy ........................................ 13

          2.   Section 1005 arbitrarily benefits members of certain racial groups ......... 15

          3.   Section 1005 ignores available race-neutral alternatives ........................ 16

    II.   Plaintiffs Will Suffer Irreparable Harm Without a Preliminary Injunction ........ 17

    III.  The Balance of Harms and Public Interest Weigh in Plaintiffs' Favor ............... 19

    IV.  No Security Should Be Required ........................................................................ 20

CONCLUSION .............................................................................................................. 21

CERTIFICATE OF COMPLIANCE .............................................................................. 22

CERTIFICATE OF SERVICE ....................................................................................... 23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adarand Constructors, Inc. v. Pena*, 515 U.S. 200 (1995)........................................................9, 13

*Airth v. City of Pomona*,
    216 F.3d 1082 (9th Cir. 2000) (unpublished) ..........................................................................12

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles*,
    559 F.3d 1046 (9th Cir. 2009) ...................................................................................................8

*April in Paris v. Becerra*,
    494 F. Supp. 3d 756 (E.D. Cal. 2020)......................................................................................19

*In re Black Farmers Discrimination Litig.*,
    856 F. Supp. 2d 1 (D.D.C. 2011), *as amended* (Nov. 10, 2011) .............................................6

*Builders Ass'n of Greater Chi. v. Cty. of Cook*,
    256 F.3d 642 (7th Cir. 2001*)* ...........................................................................................14, 15

*California Pharmacists Ass'n v. Maxwell-Jolly*,
    563 F.3d 847 (9th Cir. 2009), *vacated on other grounds sub nom. Douglas v.
    Indep. Living Ctr. of S. California, Inc.*, 565 U.S. 606 (2012) ................................................19

*California v. Azar*,
    No. 3:19-cv-01184-EMC (ECF No. 103) (N.D. Cal. Apr. 26, 2019)..................................2, 18

*Calvillo Manriquez v. Devos*,
    345 F. Supp. 3d 1077 (N.D. Cal. 2018) ...................................................................................19

*City and County of Baltimore v. Azar*,
    No. 1:19-cv-01103-RDB (ECF No. 43) (D. Md. May 30, 2019) ........................................2, 18

*City of Richmond v. J.A. Croson Co.*,
    488 U.S. 469 (1989)........................................................................9, 10, 12, 14, 15, 17

*Coal. for Econ. Equity v. Wilson*,
    122 F.3d 692 (9th Cir. 1997), *as amended on denial of reh'g and reh'g en
    banc* (Aug. 21, 1997), *as amended* (Aug. 26, 1997)..................................................................9

*Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*,
    321 F.3d 878 (9th Cir. 2003) ...................................................................................................20

*Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992 (9th Cir. 2010) .............................................5, 6

*Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297 (2013)..............................................................13

*Grutter v. Bollinger*, 539 U.S. 306 (2003)...................................................................................16

*Hecox v. Little*, 479 F. Supp. 3d 930 (D. Idaho 2020) ................................................................18

*Hernandez v. Sessions*, 872 F.3d 976 (9th Cir. 2017)..................................................................17

*Johnson v. California*, 543 U.S. 499 (2005) ..................................................................................9

*Keepseagle v. Vilsack*, No. 99-cv-3119 (D.D.C. Apr. 28, 2011).................................6, 10

*Landwatch v. Connaughton*, 905 F. Supp. 2d 1192 (D. Or. 2012)..............................20

*Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012)....................................................20

*Miller v. Johnson*, 515 U.S. 900 (1995).........................................................................9

*Monterey Mech. Co. v. Wilson*, 125 F.3d 702 (9th Cir. 1997).....................................17

*Oregon v. Azar*,
    No. 6:19-cv-00317 (ECF No. 142) (D. Or. Apr. 29, 2019) ...............................2, 18

*Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*,
    551 U.S. 701 (2007).....................................................................................9, 10, 13

*Pigford v. Glickman*,
    185 F.R.D. 82 (D.D.C. 1999), *aff'd*, 206 F.3d 1212 (D.C. Cir. 2000)...........6, 7, 10

*Regents of Univ. of Cal. v. Bakke*,
    438 U.S. 265 (1978)...........................................................................................11

*Rodriguez v. Robbins*, 715 F.3d 1127 (9th Cir. 2013) .................................................19

*Shaw v. Hunt*, 517 U.S. 899 (1996) .......................................................................10, 11

*People of State of Calif. ex rel. Van de Kamp v. Tahoe Regional Planning Agency*,
    766 F.2d 1319 (9th Cir. 1985) .............................................................................20

*W. States Paving Co. v. Wash. State Dep't of Transp.*,
    407 F.3d 983 (9th Cir. 2005) ..........................................................11, 12, 13, 14, 15

*Washington v. Azar*,
    No. 1:19-cv-03040-SAB (ECF No. 54) (E.D. Wash. Apr. 25, 2019)....................2, 18

*Winter v. Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008).................................................................................................8

*Zepeda v. I.N.S.*, 753 F.2d 719 (9th Cir. 1983)...........................................................19

**Statutes**

7 U.S.C. § 2279(a)(5)........................................................................................................3

7 U.S.C. § 2279(a)(6)........................................................................................................3

Agricultural Improvement Act of 2018, Pub. L. No. 115-334, 132 Stat. 4490 ...............6

American Rescue Plan Act of 2021, Pub. L. No. 117-2, 135 § 1005 Stat. 4 ..............1, 3

Claims Resolution Act of 2010, Pub. L. No. 111-291, § 201, 124 Stat. 3064.................7

Food, Agriculture, Conservation, and Trade Act of 1990, Pub. L. No. 101-624, §
    2501, 104 Stat. 3359 ...........................................................................................5

Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-246, § 14011, 122
    Stat. 1651 ............................................................................................................7

Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999,
    Pub. L. No. 105-277, § 741, 112 Stat. 2681 (1998)................................................7

**Other Authorities**

7 C.F.R. § 7.3 ..................................................................................................4

7 C.F.R. § 718.2 ..............................................................................................4

7 C.F.R. § 760.107(b)(1) .................................................................................3

7 C.F.R. § 761.2(b) ..........................................................................................4

7 C.F.R. § 1410.2(b) ........................................................................................3

*American Rescue Plan Debt Payments FAQ*,
    https://www.farmers.gov/americanrescueplan/arp-faq
    (last updated May 21, 2021) ......................................................................16

*AskUSDA – American Rescue Plan of 2021* (May 14, 2021),
    https://ask.usda.gov/s/article/American-Rescue-Plan-Act-of-2021.......................11

Customer Data Worksheet (form AD-2047) https://www.farmers.gov/
    sites/default/files/documents/AD2047-01192021.pdf ..............................4

Decision and Order Granting Plaintiff's Motion for Preliminary Injunction, ECF
    No. 41, *Wynn v. Vilsack*, No. 3:21-cv-00514-MMH-JRK
    (M.D. Fla. June 23, 2021) ...........................................2, 7, 10–12, 15–16

Decision and Order Granting Plaintiffs' Motion for a Temporary Restraining
    Order, ECF No. 21, *Faust v. Vilsack*, No. 21-C-548
    (E.D. Wis. June 10, 2021).............................2, 8, 11–12, 17–20

Defs.' Eleventh Status Report, *Cantu v. United States*,
    No. 1:11CV00541 (D.D.C. Oct. 26, 2015) ................................................6

Emergency Relief for Farmers of Color Act of 2021, S. 278, 117th Cong.
    ("SB 278") (introduced February 8, 2021) .............................4, 5, 11, 13

*Notice of Funds Availability; American Rescue Plan Act of 2021 Section 1005
    Loan Payment (ARPA)*, 86 Fed. Reg. 28,329 (May 26, 2021) .............3, 4

Press Release, *Department of Justice and USDA Announce Process to Resolve
    Discrimination Claims of Hispanic and Women Farmers* (Feb. 25, 2011),
    https://www.justice.gov/opa/pr/department-justice-and-usda-announce-
    process-resolve-discrimination-claims-hispanic-and-women...................6

*Socially Disadvantaged Farmers and Ranchers*,
    https://www.usda.gov/partnerships/socially-disadvantaged-farmers-and-
    ranchers (last visited June 25, 2021).........................................................5

## INTRODUCTION

Section 1005 of the American Rescue Plan Act of 2021 provides loan assistance to a subset of farmers[1] based on a single characteristic: their race. It assumes that all farmers and ranchers who are Black/African American, American Indian, Alaskan native, Hispanic/Latino, Asian American, or Pacific Islander are "socially disadvantaged," and it requires Defendants to provide them with a payment of 120 percent of their outstanding qualifying farm loans as of January 1, 2021.[2] White farmers are categorically excluded from such payments, regardless of their individual circumstances. Plaintiffs Kathryn and James Dunlap are ineligible for loan assistance under Section 1005 solely because they are white.

This Court should issue a preliminary injunction against enforcement of the "socially disadvantaged" provisions of Section 1005. Plaintiffs are likely to succeed on the merits of their claims. Because Section 1005 distributes benefits by race, it is presumed unconstitutional. To sustain the statute, Defendants must show that its racial classification is narrowly tailored to further a compelling governmental interest. While the government may in some limited circumstances use racial classifications to redress specific instances of racial discrimination, Section 1005's crude racial exclusion is not narrowly tailored to further such an interest.

Plaintiffs also meet the other requirements for a preliminary injunction. Their injury is irreparable because it involves a violation of their constitutional rights and because money

---

[1] Plaintiffs use "farmers" to refer to "farmers and ranchers."

[2] The outstanding balance is paid off in full, then the farmer or rancher is paid an additional 20 percent, which is intended to cover "tax liabilities and other fees associated with payment of the debt." *American Rescue Plan Debt Payments*, U.S. Dep't Agric., https://www.farmers.gov/americanrescueplan (last visited June 26, 2021). Qualifying farm loans include most loans issued or guaranteed by the USDA's Farm Service Agency (FSA), including direct ownership loans, operating loans, and farm storage facility loans. *See* Pub. L. No. 117-2, § 1005(a)(2), (b)(1), 135 Stat. 4.

damages are unavailable due to sovereign immunity. The harm resulting from Plaintiffs' constitutional injury far outweighs any harm Defendants might suffer if they are unable to enforce an unconstitutional statute. And because Plaintiffs' constitutional rights hang in the balance, the issuance of an injunction pending a decision on the merits is in the public interest. In short, preliminary injunctive relief is warranted to ensure that funds are not distributed under Section 1005 in violation of the Constitution's guarantee of equal protection under the law.

The U.S. District Court for the Middle District of Florida recently granted a preliminary injunction in another farmer's challenge against Section 1005. *See* Decision and Order Granting Plaintiff's Motion for Preliminary Injunction, ECF No. 41, *Wynn v. Vilsack*, No. 3:21-cv-00514-MMH-JRK (M.D. Fla. June 23, 2021) (attached as Exhibit 1). The court held that all the factors for obtaining a preliminary injunction were satisfied and issued a nationwide injunction preventing Defendants from distributing payments under Section 1005.[3] Similarly, the U.S. District Court for the Eastern District of Wisconsin issued a temporary restraining order temporarily halting payments under Section 1005. *See* Decision and Order Granting Plaintiffs' Motion for a Temporary Restraining Order, ECF No. 21, *Faust v. Vilsack*, No. 21-C-548 (E.D. Wis. June 10, 2021) (attached as Exhibit 2). This Court should adopt the reasoning of the courts in Florida and

---

[3] The Florida court's decision poses no barrier to this Court's independent authority to issue a preliminary injunction; indeed, it is persuasive authority in favor of such an injunction. In 2019, for example, four district courts—including this Court—issued parallel preliminary injunctions against the United States Department of Health and Human Services' Protect Life Rule. *See Washington v. Azar*, No. 1:19-cv-03040-SAB (ECF No. 54) (E.D. Wash. Apr. 25, 2019) (nationwide injunction); *Oregon v. Azar*, No. 6:19-cv-00317 (ECF No. 142) (D. Or. Apr. 29, 2019) (nationwide injunction); *California v. Azar*, No. 3:19-cv-01184-EMC (ECF No. 103) (N.D. Cal. Apr. 26, 2019) (injunction limited to the named plaintiffs); *City and County of Baltimore v. Azar*, No. 1:19-cv-01103-RDB (ECF No. 43) (D. Md. May 30, 2019) (injunction limited to the named plaintiffs).

Wisconsin, which show that Section 1005's loan assistance program plainly discriminates on the basis of race and violates the equal protection component of the Due Process Clause.

## BACKGROUND

**I.      Section 1005 of the American Rescue Plan Act of 2021**

**A.      Text and Operation of Section 1005**

Section 1005[4] directs the Secretary of Agriculture to "pay off" the outstanding farm loans of each "socially disadvantaged farmer or rancher . . . in an amount up to 120 percent of the outstanding indebtedness . . . as of January 1, 2021." § 1005(a)(2). A "socially disadvantaged farmer or rancher" is "a farmer or rancher who is a member of a socially disadvantaged group." § 1005(b)(3) (incorporating the definition in 7 U.S.C. § 2279(a)(5)). A "socially disadvantaged group" is "a group whose members have been subjected to racial or ethnic prejudice because of their identity as members of a group without regard to their individual qualities." 7 U.S.C. § 2279(a)(6).

The United States Department of Agriculture (USDA) has made clear that "socially disadvantaged groups include . . . : American Indians or Alaskan Natives; Asians; Blacks or African Americans; Native Hawaiians or other Pacific Islanders; and Hispanics or Latinos."[5] That list mirrors other USDA regulations defining the term "socially disadvantaged group."[6] It also includes every race and ethnicity on USDA's official Customer Data Worksheet except for

---

[4] All citations to "Section 1005" or "§ 1005" refer to § 1005 of the American Rescue Plan Act of 2021, Pub. L. No. 117-2, 135 Stat. 4.

[5] *Notice of Funds Availability; American Rescue Plan Act of 2021 Section 1005 Loan Payment (ARPA)*, 86 Fed. Reg. 28,329 (May 26, 2021).

[6] *See, e.g.*, 7 C.F.R. § 760.107(b)(1) ("Socially disadvantaged groups include the following and no others unless approved in writing . . . : (i) American Indians or Alaskan Natives, (ii) Asians or Asian–Americans, (iii) Blacks or African Americans, (iv) Native Hawaiians or other Pacific Islanders, and (v) Hispanics."); *id.* § 1410.2(b) (same).

*Memo. ISO P. Mot. for Prelim. Injunct.* - 3

"White."[7] And although women farmers are considered "socially disadvantaged" under many USDA regulations, *see, e.g.*, 7 C.F.R. § 7.3; 7 C.F.R. § 718.2; 7 C.F.R. § 761.2(b), Section 1005 applies only to race and does not include women farmers in its definition of socially disadvantaged.

### B.   Congressional Purpose in Enacting Section 1005

Congress did not include findings to explain its purpose in enacting the race-based loan assistance provisions in Section 1005. Yet the proposed (but never enacted) Senate Bill 278, which included a "debt forgiveness" provision similar to Section 1005, may shed light on congressional intent. *See* Emergency Relief for Farmers of Color Act of 2021, S. 278, 117th Cong. ("SB 278") (introduced February 8, 2021).

The stated purpose of SB 278's proposed debt forgiveness provision was twofold: "to address the historical discrimination against socially disadvantaged farmers and address issues relating to the Coronavirus Disease 2019 (COVID-19)." *Id.* § 4(a). SB 278 included broad proposed findings on alleged "systemic racism that has hindered farmers of color for generations" and an alleged "pattern of discrimination at the Department of Agriculture against Black farmers, Indigenous farmers, and farmers of color." *Id.* § 2(3), (10).

---

[7]   *See* Customer Data Worksheet (form AD-2047) at 1, https://www.farmers.gov/ sites/default/files/documents/AD2047-01192021.pdf (listing five races: "American Indian/Alaskan Native," "Native Hawaiian/Other Pacific Islander," "Asian," "White," and "Black/African American"—and two ethnicities: "Hispanic or Latino" or "Not Hispanic or Latino").

USDA could theoretically designate additional racial groups as socially disadvantaged. *See Notice of Funds Availability*, 86 Fed. Reg. at 28,330 ("The Secretary of Agriculture will determine on a case-by-case basis whether additional groups qualify under this definition in response to a written request with supporting explanation."). But in doing so, it cannot consider disadvantaged circumstances of individual farmers, only the status of racial groups as a whole. And there is no realistic possibility that Secretary Vilsack would accept a request to include white farmers as "socially disadvantaged."

To support these broad assertions, SB 278 listed various factors, everything from the historical removal of Native Americans from traditional lands, to title issues arising from Black farmers' distrust of the legal system during Reconstruction and Jim Crow, to USDA's discrimination against Hispanic farmers in credit and loan transactions. *Id.* § 2(2)–(9). It also stated that "numerous reports over 60 years have shown a consistent pattern of discrimination at the Department of Agriculture against Black farmers, Indigenous farmers, and farmers of color." *Id.* § 2(10).

SB 278 did not, however, include any specific findings or examples of discrimination against farmers who are Asian American or Pacific Islander. And despite its stated goal of "address[ing] issues relating to" COVID-19, SB 278 did not include any proposed findings about COVID-19, such as an assertion that USDA prevented "socially disadvantaged" farmers from accessing pandemic-related relief funds.

### C.    The Federal Government's Response to Alleged Historical Discrimination Against Minority Farmers

For decades, there has been an extensive federal response to allegations of discrimination by USDA against minority farmers. As one example, the 1990 Farm Bill established the Outreach and Assistance for Socially Disadvantaged Farmers and Ranchers Program (known as the "2501 Program"). *See* Food, Agriculture, Conservation, and Trade Act of 1990, Pub. L. No. 101-624, § 2501, 104 Stat. 3359. According to USDA, the 2501 Program is intended to "provide outreach and technical assistance for underserved farmers, ranchers, and foresters" and "has awarded 533 grants totaling more than $138 million."[8] These grants have "helped reach socially disadvantaged

---

[8] *Socially Disadvantaged Farmers and Ranchers*, https://www.usda.gov/partnerships/socially-disadvantaged-farmers-and-ranchers (last visited June 25, 2021). Plaintiffs request that the Court take judicial notice of all information contained on government websites cited in this motion. *See Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998–99 (9th Cir. 2010) ("It is appropriate to take judicial notice of this information, as it was made publicly available by government entities . . . and

agricultural producers—farmers who have experienced barriers to service due to racial or ethnic prejudice."[9] The 2018 Farm Bill substantially expanded funding for the 2501 Program. *See* Agricultural Improvement Act of 2018, Pub. L. No. 115-334, 132 Stat. 4490.

Additionally, USDA has paid massive sums—more than $2.4 billion—to settle class action lawsuits alleging that it engaged in lending discrimination, including against African-American, Hispanic, and Native American farmers. Perhaps best known is the *Pigford* litigation, where USDA paid out around $1 billion to a class of approximately 23,000 Black farmers under a consent decree. *See Pigford v. Glickman*, 185 F.R.D. 82 (D.D.C. 1999) (approving consent decree), *aff'd*, 206 F.3d 1212 (D.C. Cir. 2000). A subsequent class action settlement provided relief for Black farmers who were too late to file claims under *Pigford*. *See In re Black Farmers Discrimination Litig.*, 856 F. Supp. 2d 1 (D.D.C. 2011), *as amended* (Nov. 10, 2011) (approving settlement). Similarly, in *Keepseagle v. Veneman*, a court approved a class action settlement in a case brought by Native American farmers. *See* Order, *Keepseagle v. Vilsack*, No. 99-cv-3119 (D.D.C. Apr. 28, 2011). And the Department of Justice and USDA have established an administrative process to resolve the claims of Hispanic farmers who asserted that they were discriminated against when seeking USDA farm loans.[10]

---

neither party disputes the authenticity of the web sites or the accuracy of the information displayed therein.").

[9] *Id.*

[10] *See* Press Release, *Department of Justice and USDA Announce Process to Resolve Discrimination Claims of Hispanic and Women Farmers* (Feb. 25, 2011), https://www.justice.gov/opa/pr/department-justice-and-usda-announce-process-resolve-discrimination-claims-hispanic-and-women; *see also* Defs.' Eleventh Status Report, *Cantu v. United States*, No. 1:11CV00541 (D.D.C. Oct. 26, 2015) (explaining that the administrative process had approved 3,210 claims made by women and Hispanic farmers and ranchers).

Congress has strongly supported these settlement efforts. In 1998, Congress suspended application of the two-year statute of limitations, allowing claimants to assert decades-old instances of discrimination. *See* Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999, Pub. L. No. 105-277, § 741, 112 Stat. 2681 (1998). The 2008 Farm Bill stated that it was the "sense of Congress" that all pending discrimination claims and class actions brought against USDA should be "resolved in an expeditious and just manner." Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-246, § 14011, 122 Stat. 1651. Accordingly, that bill (1) imposed a moratorium on acceleration and foreclosure proceedings against farmers who alleged discrimination by USDA and (2) appropriated $100 million to settle the *Pigford* discrimination claims. *Id.* § 14012. Just two years later, Congress appropriated an additional $1.15 billion for that purpose. Claims Resolution Act of 2010, Pub. L. No. 111-291, § 201, 124 Stat. 3064.

### D.   Defendants' Subsequent Proffer of Evidence

In briefs filed with other courts that have considered this issue, Defendants have attempted to provide additional evidence that they contend supports Section 1005. As the district court in *Wynn* noted, the government cited reports contending that, as a whole, minority farmers have a harder time obtaining credit due to a host of factors, including smaller farm sizes, weaker credit histories, and lack of clear title to land. *Wynn v. Vilsack*, No. 3:21-cv-00514-MMH-JRK, ECF No. 41 at 12–13. The Court noted that because the government "fail[ed] to connect those barriers to prior or ongoing discrimination by USDA or to a need for complete debt relief," the reports did "little to move the needle in the Government's favor." *Id.*

### II.   Plaintiffs and Procedural History

Plaintiffs Kathryn and James Dunlap raise cattle and grow hay on their Oregon farm. Declaration of Kathryn Dunlap (K. Dunlap Decl.) ¶¶ 2–3; Declaration of James Dunlap (J. Dunlap

Decl.) ¶¶ 2–3. They jointly hold two farm loans that, but for the Dunlaps' race, would qualify them for loan assistance under Section 1005. K. Dunlap Decl. ¶ 4; J. Dunlap Decl. ¶ 4. But because Plaintiffs are white, they are categorically ineligible for assistance. Plaintiffs filed this lawsuit to vindicate their right to equal treatment under the law. *See* ECF No. 1.

Prior to the orders issued in Florida and Wisconsin, USDA began processing a small number of payments under Section 1005. *See* Cobb Decl. ¶¶ 28–32, ECF No. 17-2, *Faust v. Vilsack*, No. 21-C-548 (attached as Exhibit 3). And although the orders issued to date have been nationwide in scope, this scope may be altered on appeal since Defendants have consistently argued that relief should be limited to the individual plaintiffs themselves. Moreover, the orders do not prevent Defendants from processing applications. Thus, Defendants may send out payments the instant that an injunction is lifted or even modified in scope. Plaintiffs therefore bring this motion for a preliminary injunction.

## STANDARD OF DECISION

To secure a preliminary injunction, Plaintiffs must show that they are "likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

## ARGUMENT

### I.    Plaintiffs Are Likely to Prevail on the Merits

Plaintiffs are likely to prevail on their claim that the "socially disadvantaged" provisions of Section 1005 violate both the Fifth Amendment's Due Process Clause and the Administrative Procedure Act. *See* Compl., ECF No. 1, ¶¶ 54–71. Section 1005 distributes benefits on the basis

of race. "Any governmental action that classifies persons by race is presumptively unconstitutional and subject to the most exacting judicial scrutiny." *Coal. for Econ. Equity v. Wilson*, 122 F.3d 692, 702 (9th Cir. 1997), *as amended on denial of reh'g and reh'g en banc* (Aug. 21, 1997), *as amended* (Aug. 26, 1997). All such classifications are subject to strict scrutiny because they are "simply too pernicious to permit any but the most exact connection between justification and classification." *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 720 (2007) (internal quotations omitted).

The strict scrutiny test is exacting and rarely satisfied. To sustain Section 1005's racial discrimination, Defendants must show that the statute's racial classification both (1) furthers a compelling governmental interest and (2) is narrowly tailored to further that interest. *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 220 (1995). They cannot do either.

### A.    Section 1005 Does Not Further a Compelling Interest

The compelling interest requirement is designed to ascertain whether the government "is pursuing a goal important enough to warrant use of a highly suspect tool." *Johnson v. California*, 543 U.S. 499, 506 (2005) (quoting *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493 (1989) (plurality op.)). The Supreme Court has recognized only one relevant interest compelling enough to justify racial classifications: remedying the effects of past or present de jure discrimination. *Parents Involved*, 551 U.S. at 720–22.[11] To establish a compelling interest in remedying the effects of de jure discrimination, Defendants cannot rely on a "mere assertion that . . . remedial action is required." *Miller v. Johnson*, 515 U.S. 900, 922 (1995). Instead, they must show that Congress had

---

[11] Obtaining the educational benefits of diversity in higher education might also be a compelling interest, *see Parents Involved*, 551 U.S. at 722, but that is plainly inapplicable here.

"a strong basis in evidence to conclude that remedial action was necessary." *Shaw v. Hunt*, 517 U.S. 899, 910 (1996). Defendants cannot make such a showing here, for three main reasons.

*First*, "a generalized assertion that there has been past discrimination in an entire industry provides no guidance for a legislative body to determine the precise scope of the injury it seeks to remedy." *Croson*, 488 U.S. at 498. Here, Congress made no findings as to how many minority farmers have suffered racial discrimination in any "relevant market"—be it farming in general or farm loans in particular. *Id.* at 502. And even if the proposed findings in SB 278 are considered as an indication of congressional intent,[12] SB 278 failed to credit the federal government's significant and sustained efforts to remedy historical lending discrimination. As discussed above, *supra* Background Part I.C., USDA's 2501 Program has awarded over $100 million in grants in an effort to assist "farmers and ranchers who have experienced barriers to service due to racial or ethnic prejudice." And the federal government has paid out over $2.4 billion to settle and resolve *Pigford*, *Keepseagle*, and other litigation regarding alleged loan discrimination, including against Black, Native American, Hispanic, and women farmers. Congress has supported these efforts by suspending statutes of limitation and allocating settlement funds.

These efforts undermine any current interest in enacting the loan assistance plan in Section 1005 to remedy past lending discrimination by USDA. *Cf. Parents Involved*, 551 U.S. at 721 (noting that once the defendant school district "achieved unitary status" and thereby "remedied the constitutional wrong that allowed race-based assignments," "[a]ny continued use of race must be justified on some other basis").[13] As the *Wynn* Court recently pointed out, "for the Government to

---

[12] Congress's purpose is uncertain, as Section 1005 does not include any findings or explanation for its loan assistance program. In related litigation, Defendants have sought to justify Section 1005, in part, by using the interests referenced in SB 278.

[13] As two federal district courts have now found, any evidence of continuing government discrimination in farm loans after the settlements is weak and anecdotal. *See, e.g.*, *Wynn v. Vilsack*,

show that additional remedial action is warranted, it must present evidence either that the prior remedial measures failed to adequately remedy the harm caused by USDA's past discrimination or that the Government remains a passive participant in discrimination in USDA loans and programs." *Wynn v. Vilsack*, No. 3:21-cv-00514-MMH-JRK, ECF No. 41 at 11.

**Second**, the assertion (such as can be found on a USDA website)[14] that "socially disadvantaged farmers have faced systemic discrimination with cumulative effects" does not provide a compelling interest that can justify Section 1005's race-based distinction. *See also* SB 278 § 2(3) (alleging "systemic racism that has hindered farmers of color for generations"). More than 40 years ago, the Supreme Court rejected the use of race-conscious remedies to combat "systemic injustice" because it was "an amorphous concept of injury that may be ageless in its reach into the past." *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 307 (1978) (controlling opinion of Powell, J.). And as the Ninth Circuit has explained, "claims of general societal discrimination . . . cannot be used to justify race-conscious remedial measures." *W. States Paving Co. v. Wash. State Dep't of Transp.*, 407 F.3d 983, 1002 (9th Cir. 2005); *see also Shaw*, 517 U.S. at 909–10 ("[A]n effort to alleviate the effects of societal discrimination is not a compelling interest."). In short, a racial classification can only be appropriate to remedy specific instances of the government's past or present discrimination, not generalized "cumulative effects" of supposed "systemic discrimination."

---

No. 3:21-cv-00514-MMH-JRK, ECF No. 41 at 12 (noting that the "actual evidentiary support for the inadequacy of past remedial measures is limited and largely conclusory"); *Faust v. Vilsack*, No. 21-C-548, ECF No. 21 at 5 ("Aside from a summary of statistical disparities, Defendants have no evidence of intentional discrimination by the USDA in the implementation of the recent agriculture subsidies and pandemic relief efforts.").

[14] *AskUSDA – American Rescue Plan of 2021* (May 14, 2021), https://ask.usda.gov/s/article/American-Rescue-Plan-Act-of-2021.

As the Ninth Circuit explained, "to establish that an affirmative action plan is justified by a compelling government interest, there must be some showing of prior discrimination *by the governmental unit involved*." *Airth v. City of Pomona*, 216 F.3d 1082 (9th Cir. 2000) (unpublished) (emphasis added). A contrary rule would have "no logical stopping point." *W. States Paving Co.*, 407 F.3d at 1002 (quoting *Croson*, 488 U.S. at 498). It would permit Congress to continue employing racial discrimination at least until minority farmers reached economic parity with white farmers, *even after* the federal government has taken concrete action to remedy its past discrimination. It would also "effectively assure[ ] that race will always be relevant in American life, and that the 'ultimate goal' of eliminat[ing] entirely from governmental decisionmaking such irrelevant factors as a human being's race, will never be achieved." *Croson*, 488 U.S. at 495 (plurality opinion) (quotation marks omitted).

For precisely this reason, the courts in *Wynn* and *Faust* granted preliminary relief against the enforcement of Section 1005, finding that "Defendants have not established that the loan-forgiveness program targets a specific episode of past or present discrimination" and that Defendants' "summary of statistical disparities" was inadequate. *See, e.g.*, *Wynn v. Vilsack*, No. 3:21-cv-00514-MMH-JRK, ECF No. 41 at 12 (noting that the "actual evidentiary support for the inadequacy of past remedial measures is limited and largely conclusory"); *see also Faust v. Vilsack*, No. 21-C-548, ECF No. 21 at 5 (E.D. Wis. Jun. 10, 2021). Indeed, the *Wynn* Court explained that "statistical discrepancies presented by the Government can be explained by non-race related factors—farm size and crops grown" rather than racial discrimination. *Wynn v. Vilsack*, No. 3:21-cv-00514-MMH-JRK, ECF No. 41 at 14. Thus, "[e]ven taking these statistics at face value, they are less useful than they may appear to be." *Id.*

***Third***, although SB 278 indicated that it was intended to "address issues relating to the Coronavirus Disease 2019 (COVID-19)," SB 278, § 4(a), that cannot provide a compelling interest for Section 1005's race-based distinction. Neither SB 278 nor Section 1005 mention COVID-19 again or provide any evidence—let alone a "strong basis in evidence"—regarding the effect of COVID-19 on "socially disadvantaged" farmers. More fundamentally, responding to a disease or pandemic has never been recognized by the Supreme Court as a permissible basis for government discrimination on the basis of race.

### B.    Section 1005 Is Not Narrowly Tailored

Even if there were a compelling interest that could justify a race-based loan assistance program, a racial classification is so suspect that it may be legitimate only as "a last resort to achieve a compelling interest." *Parents Involved*, 551 U.S. at 790 (Kennedy, J., concurring in part and concurring in the judgment); *accord id.* at 735 (majority opinion) (favorably citing "last resort" language). Narrow tailoring analysis "involves a careful judicial inquiry" into whether the government could further its asserted interest "without using racial classifications." *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 312 (2013). As the Ninth Circuit has explained, "Congress may not merely intone the mantra of 'discrimination' to satisfy the 'searching examination' mandated by equal protection. Rather [the court] must evaluate the evidence congress considered . . . to ensure that it had a 'strong basis in evidence for its conclusion that remedial action was necessary.'" *W. States Paving Co.*, 407 F.3d at 991 (quoting *Adarand*, 515 U.S. at 223). Here, that "searching examination" shows that Section 1005's race-based restriction is not narrowly tailored, in at least three ways.

### 1.    Section 1005 uses a rigid race-based remedy

The rigid and categorical nature of Section 1005's loan assistance program shows that it is not narrowly tailored. Both the Supreme Court and the Ninth Circuit have warned in the context

of race-based set asides in public contracting that strict race-based quotas cannot be narrowly tailored to any compelling interest. *Croson*, 488 U.S. at 507–08; *W. States Paving Co.*, 407 F.3d at 994 ("A quota system is the hallmark of an inflexible affirmative action program."). That is primarily because rigid quotas are over-inclusive—they dole out benefits even to those members of the favored groups who never suffered discrimination. *Croson*, 488 U.S. at 508 (critiquing a quota system because "a successful black, Hispanic, or Oriental entrepreneur from anywhere in the country enjoys an absolute preference over other citizens based solely on their race" and declaring that it was "obvious that such a program is not narrowly tailored to remedy the effects of prior discrimination"); *see also Builders Ass'n of Greater Chi. v. Cty. of Cook*, 256 F.3d 642, 647 (7th Cir. 2001*)* ("Anyone of recent foreign origin might be able to demonstrate that he or she was a victim of ethnic discrimination, but to presume such discrimination merely on the basis of having an ancestor who had been born in the Iberian peninsula is unreasonable."). If anything, Section 1005's blanket race-based farm loan forgiveness program is *more* over-inclusive than a contracting set-aside because *every* farmer or rancher who is a racial minority qualifies for loan forgiveness—regardless of evidence of need or past discrimination. Far from being a "last resort," under Section 1005, race is the primary criterion on which the loan repayments are based.

Yet Section 1005 does not allow members of the non-favored group (here, white farmers) any avenue to prove social disadvantage. That is a marked contrast with the federal contracting preference for "disadvantaged business enterprises" (DBEs), which the Ninth Circuit held narrowly tailored in part because "a firm owned by a non-minority can qualify as a DBE if the owner can demonstrate that he is socially and economically disadvantaged," and also because a net-worth limitation "ensures that wealthy minorities who have not encountered discriminatory impediments do not receive an unwarranted windfall." *W. States Paving Co.*, 407 F.3d at 995.

Here, Section 1005's rigid racial classification not only renders the statute over-inclusive, but also *under-inclusive*, as a white farmer cannot qualify for loan assistance under the statute no matter how dire his individual circumstances. Such a categorical racial classification with no relationship to real-world discrimination or economic need is not narrowly tailored.

### 2.    Section 1005 arbitrarily benefits members of certain racial groups

Relatedly, Section 1005 cannot be narrowly tailored because of its "haphazard inclusion of minority groups" who "have not encountered discriminatory barriers." *W. States Paving Co.*, 407 F.3d at 999 (emphasizing that a government entity "that has discriminated just against blacks may not by way of remedy discriminate in favor of blacks *and* Asian–Americans *and* women" (quoting *Builders Ass'n of Greater Chi.*, 256 F.3d at 646)). Although proposed findings in SB 278 refer to alleged instances of historical lending discrimination against Black and Hispanic farmers, Section 1005 provides loan assistance for every minority race—including Asian Americans and Pacific Islanders, for whom SB 278 provides no particularized evidence of discrimination. *See Wynn v. Vilsack*, No. 3:21-cv-00514-MMH-JRK, ECF No. 41 ("Section 1005 provides debt relief to groups including Asians, Native Hawaiians, and Pacific Islanders, groups for which the evidence of prior discrimination by the USDA in farm loans, programs and services appears to be exceedingly thin.").

In fact, farmers who are members of *any* racial or ethnic group recognized by USDA other than "White" qualify for loan assistance under Section 1005, regardless of whether there is evidence that group members have suffered racial discrimination in farm loan administration. This "random inclusion of racial groups . . . suggests"—if not conclusively establishes—"that perhaps [Congress's] purpose [in enacting Section 1005] was not in fact to remedy past discrimination." *Croson*, 488 U.S. at 506.

Further, the arbitrary benefit extended to minority farmers (payment to farmers of 120 percent of eligible loan balances) does not target the problem described in SB 278 (that some minority farmers have historically been discriminated against in applying and qualifying for farm loans). Indeed, by definition, Section 1005's loan assistance program can only apply to those who have *successfully acquired* farm loans, not those who were *unable* to obtain farm loans due to discrimination.[15] That blunderbuss approach necessarily and arbitrarily excludes those who would have suffered most from lending discrimination, making it an exceedingly poor fit for remedying the problem alleged by Defendants. *See Wynn v. Vilsack*, No. 3:21-cv-00514-MMH-JRK, ECF No. 41 at 27 ("While the Government argues that a remedy for past discrimination need not be limited to remedying specific instances of discrimination, . . . it fails to explain how a remedy that by its own terms may have the effect of excluding past victims of the very discrimination it seeks to remedy is actually tailored, narrowly or not, to remedy that discrimination."). If it is true that USDA extended unfair or unequal lending terms to some minority farmers, then Congress could take more narrowly tailored actions such as requiring USDA to adjust the interest rate or other terms and conditions of any loans that are actually unfair. Extending blanket loan forgiveness to every minority farmer in the country is not narrowly tailored to the supposed justification of remedying USDA's past discrimination.

### 3.    Section 1005 ignores available race-neutral alternatives

The narrow tailoring analysis requires Defendants to engage in "serious, good faith consideration of workable race-neutral alternatives" that would allow them to achieve the interest they believe to be compelling. *Grutter v. Bollinger*, 539 U.S. 306, 339 (2003). This will ordinarily

---

[15] *See American Rescue Plan Debt Payments FAQ*, https://www.farmers.gov/americanrescueplan/ arp-faq (last updated May 21, 2021) ("If you do not have a current farm loan, you are not eligible for debt relief under Section 1005 . . . .").

involve proof "that Congress had carefully examined and rejected race-neutral alternatives." *Croson*, 488 U.S. at 507. Yet here, there is no indication that Congress considered race-neutral alternatives before selecting a blanket policy of loan repayment for all farmers who are racial minorities.

That omission is especially devastating because such alternatives appear readily available. If Congress believed that there was ongoing lending discrimination that disproportionately affected minority farmers, it could have tailored a remedy to meet that problem. For example, as the *Faust* court explained, Congress could "require[e] individual determinations of disadvantaged status or giv[e] priority to loans of farmers and ranchers that were left out of the previous pandemic relief funding. It can also provide better outreach, education, and other resources." *Faust v. Vilsack*, No. 21-C-548, ECF No. 21 at 6. Even if these alternatives would have required additional investigation or the dedication of additional administrative resources, an "interest in avoiding the bureaucratic effort necessary to tailor remedial relief . . . cannot justify a rigid line drawn on the basis of a suspect classification." *Croson*, 488 U.S. at 508. Congress's failure to consider available alternatives is convincing proof that Section 1005's loan assistance program is not narrowly tailored.

## II.    Plaintiffs Will Suffer Irreparable Harm Without a Preliminary Injunction

Where Plaintiffs allege an ongoing deprivation of their constitutional rights, courts generally presume irreparable harm. *Hernandez v. Sessions*, 872 F.3d 976, 994 (9th Cir. 2017) ("It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'") The Ninth Circuit has indicated that this presumption applies to equal protection clause violations. *Monterey Mech. Co. v. Wilson*, 125 F.3d 702, 715 (9th Cir. 1997) (concluding that an equal protection violation causes irreparable harm because "it is not apparent"

how money damages could remedy "unconstitutional discrimination"); *see also Hecox v. Little*, 479 F. Supp. 3d 930, 987 (D. Idaho 2020) (stating that an equal protection violation creates a "dispositive presumption" of irreparable harm). Thus, absent a preliminary injunction, Plaintiffs face a substantial threat of irreparable harm.

In addition, Plaintiffs face irreparable harm because farmers who have their farm loans forgiven under Section 1005 will gain an unfair competitive advantage over those, like Plaintiffs, who are required to continue to make payments on their farm loans and are therefore unable to use that capital for other investments or improvements. Even if the Court eventually invalidates Section 1005, that would not reinstitute any loans forgiven for competitors during the pendency of the litigation and therefore cannot restore the status quo. *See Faust v. Vilsack*, No. 21-C-548, ECF No. 21 at 9 ("Once a loan is forgiven, it cannot easily be undone.").[16] And although there is a nationwide preliminary injunction currently in place, courts have not hesitated to issue overlapping preliminary injunctions. *See Washington v. Azar*, No. 1:19-cv-03040-SAB (ECF No. 54) (E.D. Wash. Apr. 25, 2019) (nationwide injunction); *Oregon v. Azar*, No. 6:19-cv-00317 (ECF No. 142) (D. Or. Apr. 29, 2019) (nationwide injunction); *California v. Azar*, No. 3:19-cv-01184-EMC (ECF No. 103) (N.D. Cal. Apr. 26, 2019) (injunction limited to the named plaintiffs); *City and County of Baltimore v. Azar*, No. 1:19-cv-01103-RDB (ECF No. 43) (D. Md. May 30, 2019) (injunction limited to the named plaintiffs). After all, Plaintiffs would suffer irreparable harm the moment an injunction were to be vacated or even modified in scope.

---

[16] The district court in *Faust* also noted that a specified portion of the $1.9 trillion American Rescue Plan has been allocated to farm loan assistance, and "the 8,580 farmers and ranchers who were sent offer letters represent approximately 49% of the loans that will be forgiven under the program." *Faust v. Vilsack*, No. 21-C-548, ECF No. 21 at 7. Accordingly, it is entirely possible that in the absence of an injunction, all of the funds currently allocated to the program may be depleted. *Id.* at 8.

Plaintiffs' injuries are also irreparable because they cannot seek monetary relief due to Defendants' sovereign immunity. *See California Pharmacists Ass'n v. Maxwell-Jolly*, 563 F.3d 847, 852 (9th Cir. 2009), *vacated on other grounds sub nom. Douglas v. Indep. Living Ctr. of S. California, Inc.*, 565 U.S. 606 (2012) ("We are persuaded that because the Hospital Plaintiffs and their members will be unable to recover damages against the Department even if they are successful on the merits of their case, they will suffer irreparable harm if the requested injunction is not granted.")*. See also April in Paris v. Becerra*, 494 F. Supp. 3d 756, 770 (E.D. Cal. 2020) ("Where . . . sovereign immunity bars a financial recovery, monetary injury may be irreparable."); *Calvillo Manriquez v. Devos*, 345 F. Supp. 3d 1077, 1106 (N.D. Cal. 2018) ("Where sovereign immunity bars certain types of damages, those damages can constitute irreparable harm."). Thus, a preliminary injunction is necessary to ensure that Plaintiffs are able to secure full relief. *See Faust v. Vilsack*, No. 21-C-548, ECF No. 21 at 8 ("Plaintiffs' injuries are also irreparable in light of Defendants' sovereign immunity and Plaintiffs' inability to seek damages.").

### III.     The Balance of Harms and Public Interest Weigh in Plaintiffs' Favor

The irreparable harms that Plaintiffs will suffer without a preliminary injunction outweigh any harm that the preliminary injunction would cause Defendants. This is clear because the government "cannot suffer harm from an injunction that merely ends an unlawful practice." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013); *see also Zepeda v. I.N.S.*, 753 F.2d 719, 727 (9th Cir. 1983) ("[T]he INS cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations."). Moreover, Defendants cannot show that an injunction would cause them any direct harm, since it would simply prevent them from providing loan assistance in a race-based fashion. And Defendants have declared "that they will not foreclose on any delinquent loans and that banks holding USDA-backed loans will

not foreclose on them." *Faust v. Vilsack*, No. 21-C-548, ECF No. 21 at 8. Thus, a preliminary injunction would not put minority farmers who might otherwise receive payments under Section 1005 at risk of foreclosure. By contrast, absent a preliminary injunction, Plaintiffs would suffer an irreparable violation of their constitutional rights.

Similarly, because Section 1005 violates Plaintiffs' constitutional rights, an injunction is in the public interest. Indeed, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012). Because Plaintiffs have established a strong likelihood of success on the merits of their constitutional claim, the public interest weighs in favor of a preliminary injunction to restrain Defendants from enforcing a likely unconstitutional statute.

## IV.     No Security Should Be Required

No bond should be required in this case. "Federal courts have consistently waived the bond requirement in public interest . . . litigation, or required only a nominal bond." *Landwatch v. Connaughton*, 905 F. Supp. 2d 1192, 1198 (D. Or. 2012) (citing *People of State of Calif. ex rel. Van de Kamp v. Tahoe Regional Planning Agency*, 766 F.2d 1319 (9th Cir. 1985)). Moreover, Plaintiffs have established a strong likelihood of success on the merits given Defendants' explicit reliance on race, a highly suspect classification, and this "tips in favor of a minimal bond or no bond at all." *Van De Kamp*, 766 F.2d at 1326. Finally, "the bond amount may be zero if there is no evidence the party will suffer damages from the injunction," and that is the case here. *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 882 (9th Cir. 2003). There is therefore no need for a bond or other security.

## CONCLUSION

The Motion for a Preliminary Injunction should be granted.

DATED: June 29, 2021.

Respectfully submitted,

Wencong Fa
Cal. Bar No. 301679*
Daniel M. Ortner
Cal. Bar No. 329866*
Pacific Legal Foundation
930 G Street
Sacramento, California 95814
Telephone: (916) 419-7111
WFa@pacificlegal.org
DOrtner@pacificlegal.org

By /s/ Christina M. Martin
Christina M. Martin, OSB #084117
Pacific Legal Foundation
4440 PGA Blvd., Suite 307
Palm Beach Gardens, Florida 33410
Telephone: (561) 691-5000
CMartin@pacificlegal.org

Glenn E. Roper
Colo. Bar No. 38723*
Pacific Legal Foundation
1745 Shea Center Dr., Suite 400
Highlands Ranch, Colorado 80129
Telephone: (916) 419-7111
GERoper@pacificlegal.org

*Attorneys for Plaintiffs Kathryn and James Dunlap*
*\* pro hac vice*

## CERTIFICATE OF COMPLIANCE

This brief complies with the applicable word-count limitation under LR 7-2(b), 26-3(b), 54-1(c), or 54-3(e) because it contains 6,395 words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, signature block, exhibits, and any certificates of counsel.

/s/ Christina M. Martin
Christina M. Martin, OSB #084117

## CERTIFICATE OF SERVICE

I hereby certify that on June 29, 2021, I caused the foregoing to be served via U.S. Priority

Mail (certified) on the following parties:

Thomas J. Vilsack, Secretary
U.S. Department of Agriculture
1400 Independence Avenue, S.W.
Washington, DC 20250

Zach Ducheneaux, Administrator
Farm Service Agency
U.S. Department of Agriculture
1400 Independence Avenue, S.W.
Washington, DC 20250

Merrick Garland
Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Acting U.S. Attorney Scott Erik Asphaug
c/o Civil Process Clerk
1000 SW Third Ave Suite 600
Portland, Oregon 97204

/s/ Christina M. Martin
Christina M. Martin, OSB #084117